Good morning, Your Honors. David Bovet, appearing on behalf of the appellants and plaintiffs. First, I'd like to thank the Court for accommodating my schedule this week. And we're here because the district court granted qualified immunity to Defendant Royal, who's the sole remaining plaintiff in the case, under the second prong of saussure. So part of my argument will be devoted to the essential question in this appeal of whether Royal had fair notice of what her duties were when she removed these children in light of the case law that existed at the time. Let me ask you this question. Are you simply asking us, at least my impression, you're simply asking us to reverse the grant of qualified immunity, not to make a determination as to how the case should come out after trial on that question? No. We're asking that the Court reverse the district court on its qualified immunity finding and grant summary judgment to us. Did you argue in your brief how the rule would apply if we assumed the facts most favorably to the social worker? I argued in my brief that the undisputed facts, giving credit to they have raised a number of issues that relate to the neglect issue. And those are things like the condition of the house, alleged misstatements made by my clients to the social worker at the time of the investigation. But when you distill all of that out, the reason why we're entitled to summary judgment is because there's no imminent threat in this case under anybody's theory. Counsel, in this case, though, as I understand it, the social worker was advised approximately a week before she went out to the house about conditions. Obviously, she wasn't terribly concerned at the time because she didn't go out immediately. Yet when she got there, she was sufficiently concerned that she immediately took the children to the hospital. Given the fact that there was no case law, at least it's been cited to us, that's expressly on point, isn't it a reasonable presumption that for whatever reason what she saw concerned her enough that she would take the children immediately to the hospital? Okay. Well, let me just say a couple of things because part of what the Court has said I think is a little bit off from what the record shows. Okay. This case came as a referral to the San Joaquin County Child Protective Services line on August 20th. The contact made by the social worker was on September 7th, so we're talking about some 18 days. Eighteen days. And between she came and couldn't get in, there was no one home. She made one attempt. Yeah. And then came back a second time a week later. Right. In that initial report, many of the allegations that she now makes about the condition of the house are in that report. For example, Tommy's teeth is reflected in the initial referral. The so-called locked doors, which there's some dispute about what that really meant, but that was also in the initial report. What it comes down to That doesn't make them true. It just meant that she knew them before she went there. Right. And that it didn't spur her to immediate action. So she didn't think on the basis of those things alone that there was any emergency that she needed to get out there right away. The second point is that her investigation inside the residence took somewhere between an hour and a half and two hours. So she did not come and take the children immediately to the hospital. She took them after she had searched the entire house with the officer who was there. They had had long conversations with the parents. She took them for a variety of reasons. This was only one of the reasons that she set forth for taking them. And when she got to the hospital, she didn't tell the doctor from what we can see in this record. And that would be on pages 90 and 91 of the excerpts, which are the two emergency room reports. Rather than say, I'm here because I think the children are suffering from malnutrition. She says, I'm here to have them screened so that they could be sent to foster care. And she says Is that what a CPS placement means? Yes. What is CPS? Child Protective Services. So she's there to have the children evaluated for a foster care placement. Doesn't say anything about malnutrition. And nor does the doctor find anything about malnutrition. And then the doctor has her reporting that there's a substance abuse problem in the home, which is not supported anywhere in this record. What's your theory of damage? The children remained out of the home for 14 days. Mother had some psychological treatment as a result of the separation. Children were very, very disturbed by it. They exhibited symptoms. Whose damages are you taking? The children or the mother or the father? All of them. All of them? The children? Children too? Children too. Are the children playlists? Yes. I would like to get to the issue of whether or not this social worker was on fair notice of the standard. I thought that, you know, Judge Levy's analysis was interesting. And he's a very good judge and a rather erudite judge, in fact. But the difference is You're good enough to be a law professor. I'm sorry? The distinction that Judge Levy makes in this case, though, between discreet acts of abuse, which is what prior cases have been about, and malnutrition, which is a continuing harm, doesn't appear to be relevant to the standard that this standard for a warrantless removal is that there be reasonable cause to believe that the child is in imminent danger of serious bodily injury, and that the removal is necessary to avert that specific harm, is the standard that you articulated. I see nothing in that standard that requires as a predicate for applying it that the social worker should only be on fair notice. They should only be concerned about the next punch in the face, or should only be concerned about the next act of sexual abuse. The standard is certainly broad enough to signal to any reasonable social worker that before you remove a child from the home without a warrant, there had better be a physical problem, and it better lead to reasonable belief that that problem is causing an imminent harm to the child. And in order to avert that harm, you have to remove that child from the home. And I see nothing in this case that would throw off a social worker or confuse a social worker about what the standard is. And Wallace was decided before this removal took place. And other cases in the Ninth Circuit also were decided before, such as Maid v. San Bernardino County, Ram v. Rubin from 1997. So all of this, this body of law was in place at the time that the social worker took the actions that were taken. This is a summary judgment case, isn't it? Yes. Does that make a difference? Well, I'm trying to look at this from the standpoint of undisputed facts. It's a summary judgment, but there are disputed issues of fact. There aren't. There's no disputed issue of fact that's imminent. Well, hold on. We've got two issues, two problems here. One, he gave summary judgment to the other side, and you're appealing that. Right. So you've got one answer to that question. And I have another answer. And a different answer to the second question. Are you entitled to summary judgment? Okay. I'm not sure whether Dick Ferguson's question is to both, but you were answering it as if. I'm going to answer it both ways like you suggested. Okay. So the first question is a question of law as to whether or not the law was clearly established because the district court found that there was a violation here. And we agree with that. We agree with that analysis. So when we get down to is the law clearly established, as I've just stated, I think that the principle that was announced in Wallace v. Spencer is broad enough to encompass this conduct. It doesn't have to be, the case law doesn't have to be on all fours. As Diorrele indicated, Diorrele v. Rutherford, another decision in this court in an excessive force case, said, you know, you don't have to come in with precisely the same factual scenario in order for the social worker to be liable or for the defendant to be liable. They pointed to the. Well, it's possible to have a different answer to the question of whether the county is entitled to summary judgment than it is to whether you're entitled to summary judgment. Right. And I agree with that. Yes. I think to answer Judge Ferguson's question, you would have to say, well, clearly the facts, the county isn't entitled to it. But then would you explain why you should be entitled to it? There are some differences in the facts. There are. But none of the facts, in my opinion, are. Your view would have to be that even if you assume the county's version of the facts, you would be entitled to summary judgment. Right, exactly. And that's the position we take, that all of the disputed facts. Why do you claim you're entitled to summary judgment? Why don't you claim that there ought to be a trial? Because those are not material disputed facts. There are disputed facts that go to the condition of the home. There are disputed facts that go to what my clients told the social worker at the time. They tried to paint a picture of her as being a liar. But let's accept all of that. Still, there's no imminent danger to the children based upon the visual observations of the social worker that the children have thin hair. Is that a matter of fact or is that a matter of law? I think it comes down to a matter of law. Materiality is a question. Matter of law? It's a matter of law. The materiality is a matter of law. It's a question of law. But I know that is what the facts lead to, that materiality. Those are the facts. It's a matter of fact, isn't it? We're accepting that my clients lied. We are accepting that the house was a mess. We're accepting that the children had thin hair. We're accepting that Tommy's teeth were bad. We're accepting all of that. And we're saying, look, in light of Wallace v. Spencer, that's not enough. There has to be an imminent danger to these children to expand the warrant. Is there any evidence here or was there any agreement on how long it would take to get a warrant? There was no agreement on that. Is there a disagreement? I don't think anyone actually assessed how long it would take to get a warrant. All right. Let me ask the county what their estimate is. Because that determines, could determine to some extent, what the risk is of leaving a child in a home. If it takes six days to get a warrant, you'd have a different view than if it took three hours. Well, I've practiced juvenile law in San Joaquin County. I can tell you the courts are open five days a week. The juvenile dependency court is open. This occurred on a weekend early in the morning. It was 830 in the morning. A weekday? A weekday. Yeah. These children, you know, they had just gotten up. The family had just gotten up. You know, the paleness. I mean, a lot of people don't look good in the morning. I just look at this as if it's hard to find how a social worker could look at the situation and think these children are in immediate peril. And it's also difficult to understand how they could meet the second prong of the Wallace standard, that there were other options available to this social worker. Is the only issue here, I mean, the principal issue here, whether they should have obtained a warrant before removing the children? That is, that's how we have framed the case, is the lack of a warrant is the due process violation, and that these children did not need to be removed. Services could have been provided to the family. Under anybody's, except anybody's facts in this case, services could have been provided in the home. A warrant could have been obtained beforehand if they thought one was necessary. A public health nurse could have evaluated the children. I want to go back to a question that Ferguson asked earlier. At the least, even under your theory, the case would have to go back to damages. And an issue on damages might be whether if the children would have been removed with a warrant, then your damages might not be very much compared to what they would be if they wouldn't have been removed had there been a warrant, had they sought a warrant. That's certainly possible. So you're going to have to get into trial in any event. Well, we've never reached that issue. No, no. But I say if you went to damages, you'd really have to try all the same things you'd have to try if there were, in order to establish liability. Well, I think what the Court's referring to is the Peratt standard. Peratt or Peratt, the U.S. Supreme Court case. I didn't hear you. Peratt or Peratt, the U.S. Supreme Court case that talks about the due process violation and affording a subsequent hearing and looking back to see whether if a hearing had been held timely, there would have been damages. We would have at minimum had a due process violation anyway. I'm assuming the best case from your standpoint, which is that you establish here that under either version of the facts there's no emergency that excuses the failure to obtain a warrant. If you do that, it still has to go back to damages. It still has to go back to damages. And if it goes back to damages, what I'm saying is that all the same issues would be tried in the damages trial that the county would like to try in a liability trial if you didn't get somebody charged with it. They might be circumscribed to some extent, and we might have arguments about the juvenile court case as well. Okay. Can I reserve the rest of my time?  Thanks. Ms. Johnson. Good morning, Your Honors. May it please the Court, my name is Kimberly Johnson, and I represent the only remaining appellee defendant, Charlotte Arroyo, the social worker.  Do you have any disagreement that a warrant could have been obtained during the day? Based upon what I know about the way our juvenile dependency court runs, we are open five days a week, and I can't tell you or give you an estimate of how long it would have taken to get a warrant, but I think it's probably a matter of hours versus days, Your Honor. Okay. Secondly, do you feel that at this stage of the briefing and appeal that the issue of whether summary judgment could be granted for your assume for the moment that it's reversed as to your obtaining summary judgment? Do you feel that the issue is properly before us as to whether summary judgment on liability can be obtained by not whether they should win, but is the issue properly before us on whether summary judgment should have been granted for your opponent? Your Honor, I think as it relates to summary judgment or the thought of summary judgment being granted to our opponent, it's not properly before this Court, Your Honor. I maintain that in deciding whether or not to grant summary judgment in favor of appellant's plaintiff, you have to take all of the facts, the non-disputed facts that are material in the favor that's in light most favorable to Ms. Warren. Yes. Right. That's true. And I would say, Your Honor, there is in existence a number of disputed facts. Well, no, but the disputed facts would be taken in favor of your client. That's right, Your Honor. Yes. Now, if we took the disputed facts in favor of your client. I would say that appellant would not be entitled to summary judgment.  But I'm not asking whether they'd be entitled to it. I'm asking you whether the issue is presented to us about whether they are entitled to it. I'm sorry, Your Honor. Can you repeat your question again? The question is not whether they should win, but is the issue before us. Can we decide that question now? If we give you the benefit of assuming all of the facts in favor of you, can we then decide that say that you that they're not entitled to summary judgment or that they are? Is that issue before us? I think it is, Your Honor. Okay. Counsel, your opposing counsel mentioned the case of Wallace v. Spencer as, I suppose, prototypical of the kind of law that existed prior to the occurrences that are the subject of this lawsuit. What is your response to his allegation that there was more than enough law available that should have been known by your client when she took the action that she did? That she would have, if she had any kind of care, she would have known she was violating the constitutional rights of his clients at this point. What is your response to that? Your Honor, I would say that prior to September of 2001, which is when the removal took place, the law that was on the books that dealt with the removal of children without warrants articulated a standard which indicated that a child could not be removed from the home of their parent without a warrant, absent reasonable belief that the child was in imminent or danger of imminent bodily harm. And I would say that the cases that took that standard and developed that standard and articulated those standards, those cases primarily dealt with physical abuse. We also have the case of, I believe it's May, that dealt with emotional abuse. And frankly, we don't have a carving out in the statute that says you can take a child who's suffering from emotional abuse without a warrant, but those cases really dealt with physical and sexual abuse, where the focus was on the likelihood of reoccurrence of that abuse. In this case, we have a case where the children are suffering from medical neglect. And the district court correctly recognized that medical neglect is a continuing harm that can result in a serious medical condition that may or may not require immediate treatment of the children. The court also indicated that in deciding whether or not someone is suffering from medical neglect and in determining the severity of the medical neglect, really what we're calling on our social workers to do is to make a medical opinion about the child and about the severity of the condition for which the social worker may not have adequate training because the social worker is not a medical professional. So from your perspective, the May and the other case that was cited deal with issues other than medical neglect, of course, and there was no case law on medical neglect. Basically, it was left to your client to make a, as she viewed it, a reasonable determination. She was concerned. She took them to the hospital. Now, your opposing counsel said that when she went to the hospital that she said that they were there for an evaluation for placement in foster care. That's not what Judge Levy said, at least in his opinion. He said that after the evaluation, the medical evaluation, they were evaluated for placement. What are the facts in the record as you understand them in terms of what your client said when she first went to the hospital? As I understand the record, Your Honor, and what I can take from the exhibits that are in the record, is that the notation that said placement was on a Lodi Memorial form that the treating physician, and I believe it's a nurse practitioner, eventually signed, and I believe that Ms. Royal signed indicating that she consented to the instructions that's on that form. What we know from the record and from Ms. Royal's testimony is that she indicated that the children looked horrible to her, and that she looked horrible to her, that she thought that they had been severely neglected, and from her interaction with the parents, she concluded that they had been neglected for some time, especially the little boy, Tommy, because what the record indicates is that prior to the time the CPS worker appeared at the home, Tommy had not been seen by a dentist for almost a year, and at that last dentist appointment ---- Do you think it was really an emergency if he wasn't seen in the next few hours? I'm sorry, Your Honor. Do you think it was an emergency if he wasn't seen by a dentist in the next few hours? Can you repeat that? I'm sorry. If he hadn't been seen for a couple of years, could it be an emergency for him not to be seen in the next few hours before she got a warrant? I think Ms. Royal reasonably concluded it could have been an emergency. What we know is that the little boy's teeth were suffering from rampant decay. I think his mother even said that they were in horrible condition. He was suffering from bottle rot. And, Your Honor, we know that infections of the gums and the teeth could potentially lead to infection, which could potentially lead to death. So I think given the totality of the circumstances that Ms. Royal faced, when she appeared in that home on that day led her to believe that she needed to get the children and take them to the hospital. Who made the ultimate decision to take the children, the social worker or the police officer? Your Honor, I'd say that ---- Well, that was never solved, was it? No, it was not. The district court judge didn't say one or the other. That is correct. I think the district ---- No, Your Honor, I don't think ---- If the officer made the decision to remove, he subsequently placed the children in the care of a CPS worker. Well, that's a different ballgame. Well, I think, Your Honor, if the CPS worker concluded or disagreed with the officer, the CPS worker would have been well within her right to call her staffing manager and work with her manager and on the spot make a determination of whether or not the children could be returned back to their parents. So you're saying the decision was the social worker's decision? I'm saying, Your Honor, that the record isn't clear about who made the decision. No, but I thought you were saying that even if the officer said take them to the hospital, it was the social worker's ultimate responsibility either to accept that or to go to her supervisor. That is correct, Your Honor. And so the question is whether ---- okay. So in any event, you're saying it was her ultimate decision to ---- Yes, Your Honor. I'm saying that if the police officer made the decision to remove the child, the child subsequently went into the custody of CPS who, because she also took the child to the hospital, concurred with the officer's decision. Medical neglect cases, I think what Judge Levy recognized is that medical neglect cases sometimes present an ambiguous set of facts to the social worker who may not have the necessary medical training to make a judgment call as it relates to the severity of the medical neglect, because she is not a medical professional. However, in the case of Saucier, the U.S. Supreme Court recognized that the qualified immunity should not be applied in a level of generality. In fact, what the court said is that the application of the qualified immunity requires an individualized, fact-specific inquiry to the situation the social worker faces at the time that she decides to remove the children. In this case, Your Honor, I would say that Ms. ---- Well, you just said that she decided to remove the children, not the police officer. And I'm saying that she either decided or she concurred with the officer's decision. Well, there's nothing in the record that indicates that at all. He had the show of authority. He says, take these kids. And I think the record will demonstrate, Your Honor, that Ms. Royal concurred with that decision. Are we also, to some degree, dealing with an unknown here? Say they didn't go to the hospital, and say the kid, Tommy, developed peritonitis, developed a serious problem, had permanent injuries, and she had not taken him to the hospital. What would the local press have said about the service that your client works for at that point? Well, Your Honor, I'm sure it would have made the local newspaper. If she had waited three or four hours to get a warrant? If she had waited three or four hours and something horrible had happened to Tommy Rogers. No, but it's a periodontal problem that Judge Smith's talking about. They would say in the local press that this child got a periodontal problem in the three hours it took to get a warrant? Given Judge Smith's example, if it had been a periodontal problem that was severe, it would have made the local papers ask some of these cases. If a dentist's expert dentist said that it was in that three hours that this problem became serious, that it was no serious problem when she arrived, but if she had gotten the warrant, in the three hours that it took her to get the warrant, this became acute. Then you'd have a press story. You'd have to find a dentist who said that it was a three-hour delay that caused this problem. Your Honor, I think had Ms. Royal not taken these children and something horrible had happened to them. Had not taken the children and gone to get a warrant? Correct. If she had not gotten the warrant and she had taken the children and something horrible had happened to the children, it would have... Something horrible meaning a deterioration in the teeth. You're not talking about the children being murdered, are you? Well, Judge Smith's example led me to believe something greater than a deterioration of the gums. Well, I thought he asked about periodontal problems. Yeah, I know. My example, and I don't know how much further we can take this, but periodontal disease is a progressive thing. It takes place over a period of time. From what we've heard and what we've read in the record, this was a cumulative problem with Tommy. I pointed out simply as an example that to some degree, social workers are a little bit like policemen and women. They're on the line. If something requires quick action, sometimes as a court we might look back as Monday morning quarterbacks and say, well, that's what we did differently. But when you're right there and you see people, isn't your client a little bit like a policeman in that setting? I would say she's called to make an on-the-spot determination based upon her training and her skills about whether or not she should carve the time out to go get a warrant or whether or not she should rush those children over to the hospital to be seen by a medical professional. Well, that's why we have laws about warrants. I mean, police officers always think that they ought to do something right away, but they don't. They're not allowed to. They've got to go get a warrant first, and she's in that same position, unless it's a real emergency. And then a police officer may be able to overlook the basic constitutional protection. And a social worker's in that same position. If it's a real emergency, she can overlook the constitutional protection. And I would agree with Your Honor's statement. And what Judge Levy found and what we think was correct is what he said is that in the case of a medical neglect situation, we don't have any cases prior to this decision that told us what a real emergency looks like in a medical neglect case. Well, even if we had a decision, we wouldn't have one about a periodontal decision. We'd have a decision that said what a real emergency is. And then you'd probably be telling us, well, but she's not really an expert, so she doesn't know about whether a periodontal problem is a real emergency. Your Honor, in light of the Court's decision, we do know that in light of Judge Levy's decision, we know that the situation that Ms. Roehl encountered on September 9th was a medical negligence. And that was September 2001. We know that now, in hindsight. We know that the Court has concluded that wasn't a real emergency. So we're going to have to have a decision on each possible physical condition so that you'll know that that one. We now know about periodontal because of Judge Levy, but you don't know about the next ailment. Well, what we know because of Judge Levy's decision is that we know about medical neglect cases. Prior to that, we knew about physical abuse and we knew about sexual abuse. And now we have another area of the law where we know what is considered to be an imminent risk to the health and safety of a child and what is not. And prior to this decision, our social worker did not know that. She made a good faith but mistaken belief about what her ability was in terms of removing the children without a warrant. So you do concede it was a mistake? Well, you can see that Judge Levy has said it was a mistake, and that's the law at the moment. Until we say Judge Levy made a mistake. What did the guns have to do with this case? Only that one of the referrals that CPS received was that there were guns, and I'm not sure if it was loaded or unloaded, but that there were guns in the home. And upon entering the home, the police did question the father about the guns. The father showed them where the guns were, and if I recall the record correctly, it appears that the guns were in a place where they could not be accessible by the children. No issue then that that involved a problem of immunity? No imminent danger. I would say, Your Honor, that at the time the decision was made to remove the children, the guns posed no imminent danger. Okay. Just one other question I have. When this Court rules in cases like this, it has a significant impact. Will the average social worker, and I'm hypothesizing here, will the average social worker who sees this case, if it comes out saying that qualified immunity is removed, notwithstanding the fact that we're dealing with the most vulnerable members of our society, instead of erring on the side of the children, we're going to err on the side of the legal liability of the social worker? Do you have an opinion as to what the average social worker is going to do in that kind of a situation? Does it have an impact? I think it does. I think that in cases where there is a close call, the social worker may triple check him or herself before they decide to remove a child without a warrant. I think what that means on one hand is that we will ensure that the rights of parents, the constitutional rights of parents and children are protected because now we go in and get a warrant, whereas we didn't do that before. But what that may mean is that we, for the few hours or the few days it takes to get a warrant, we may leave a vulnerable child in a very dangerous situation. Well, in this case, there was a police officer involved. There was. But does that make a difference or not in this case? I don't know that it makes a difference, Your Honor. The peace officer is still required to respect the constitutional rights of the parents and of the children. He was bound by the Constitution like she was. Absolutely, Your Honor. If I just may conclude, we respectfully ask that the district court's decision affirming summary judgment in favor of appellee be affirmed. Thank you, Your Honor. Thank you very much. It was very helpful, I think. Just a few comments. I don't have much time left anyway. First of all, I want the court to know, and I think this is fully supported by the record, that these were very cooperative parents, that the parents were very cooperative with the social worker and the police officer who were there. And this also highlights the point that this social worker could have taken these children to the hospital if she, given her lack of medical training, would not have fully appreciated what she was dealing with. The parents were willing and told her that they wanted to go to the hospital with her, and she said no. Number two, she never took them to the dentist that day or any other day. The children were in care of this department for 14 days with no dental treatment. That was accomplished after they were returned home to the parents. Finally, I think what the record supports ---- Would the social service agency have had to pay for the dental care, or would the parents still have had to pay for it? I think probably social services would pay for it, or the children. I don't think the children had Medi-Cal. I don't think they had any health insurance at all at that point. So I think the county would have to pick up the tab. Finally, with respect to the level of specificity for qualified immunity, I think that's not the issue here. The issue is whether the social worker had fair warning, and I think the social worker did, given the standard that I had indicated before. And I also think that we have raised the issue, and this Court can decide that we're entitled to summary judgment on appeal, that when you look at the facts that they point to as disputed, they don't impeach this Court's ruling on summary judgment for us if it were to decide to do that. Thank you very much. Thank you, counsel. Thank you both very much for the argument. The case just argued will be submitted. The next case is United States v. Coconus.
judges: Ferguson, Reinhardt, M. Smith